IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT
_____

**ANANTH PRASAD, in his official capacity as
Secretary of the Florida Department of Transportation,**

**Appellant,**

**vs.**

**ODEBRECHT CONSTRUCTION, INC.,**

**Appellee.**
_____

On Appeal from an Order Granting a Preliminary Injunction
of the United States District Court, Southern District of Florida
_____

SECRETARY'S INITIAL BRIEF
_____

GREGORY G. COSTAS
Assistant General Counsel
MARC A. PEOPLES
Assistant General Counsel
Florida Department of Transportation
605 Suwannee Street, MS-58
Tallahassee, Florida  32399-0458
(850) 414-5265
gregory.costas@dot.state.fl.us
marc.peoples@dot.state.fl.us

ODEBRECHT CONSTRUCTION, INC.  CASE NO:  12-13958-C

vs.

SECRETARY
_____

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rule 26.1, Fed. R. App. P., and 11th Cir. R. 26-1.1, Appellant, Ananth Prasad, in his official capacity as Secretary of the Florida Department of Transportation, certifies that the following persons and entities may have an interest in the outcome of this case:

Belgravia Empreendimentos Imobiliarios S.A.

Cantero, Raoul G., Esq.

COI Overseas Ltd.

Companhia de desenvolvimento e Participacoes S.A.

Companhia do Obras e Infra-Estructura

Construtora Norberto Odebrecht S.A.

Costas, Gregory G., Esq.

Curington, Gerald B., Esq.

Florida Department of Transportation

Martin, Paul J., Esq.

McAliley, Neal T., Esq.

ODEBRECHT CONSTRUCTION, INC.          CASE NO:  12-13958-C

vs.

SECRETARY
_____

Moore, Hon. K. Michael, United States District Judge

Moye, James E., Esq.

Moye, O'Brien, O'Rourke, Pickert, & Dillon, LLP

Odebrecht Construction, Inc.

Odebrecht S.A.

Peoples, Marc A., Esq.

Prasad, Ananth, as Secretary, Florida Department of Transportation

White & Case, LLP

# STATEMENT REGARDING ORAL ARGUMENT

This appeal involves substantial issues concerning the interaction of the states' inherent power to allocate public funds with the restraints against state action residing in the Supremacy Clause, the Foreign Affairs Power, and the dormant Foreign Commerce Clause. Consequently, Ananth Prasad, as Secretary of the Florida Department of Transportation (Secretary),[1] believes that oral argument would be of particular benefit to the Court.

---

[1] Plaintiff/Appellee, Odebrecht Construction, Inc., will be referred to herein as Odebrecht.

# TABLE OF CONTENTS

TABLE OF CITATIONS ........................................................................ iv

STATEMENT OF JURISDICTION ....................................................... 1

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF THE CASE ............................................................... 4

    A.  Course Of Proceedings ........................................................ 5

    B.  Statement Of The Facts ....................................................... 9

    C.  Standard Of Review .......................................................... 11

SUMMARY OF THE ARGUMENT ..................................................... 13

ARGUMENT ...................................................................................... 18

    ODEBRECHT FAILED TO ESTABLISH ITS SATISFACTION OF THE
    CRITERIA WARRANTING THE ISSUANCE OF A PRELIMINARY
    INJUNCTION ................................................................................ 18

        A.    The Cuba Amendment Does Not Violate The United States
              Constitution With Respect To The Supremacy Clause, The
              Foreign Affairs Power, Or The Foreign Commerce Clause, Nor
              Is The Amendment Inoperative By Its Own Terms. ................... 19

              1.  The Supremacy Clause ................................................... 19

              2.  The Foreign Affairs Power ............................................. 30

              3.  The Foreign Commerce Clause ...................................... 35

              4.   The Cuba Amendment Is Not Inoperative

                  By Its Own Terms ....................................................... 41

B.    Odebrecht Failed To Establish That It Would Suffer Irreparable Injury Unless The Preliminary Injunction Issued. .....................43

C.    Odebrecht's Perceived Injury Does Not Outweigh The Harm An Injunction Would Visit Upon The State's Ability To Manage And Control Its Financial Affairs. ............................................46

D.    A Preliminary Injunction Disserves The Public Interest. ..........48

CONCLUSION ......................................................................................................50

CERTIFICATE OF COMPLIANCE ......................................................................50

CERTIFICATE OF SERVICE ...............................................................................51

# TABLE OF CITATIONS

**Cases**

Alden v. Maine, 527 U.S. 706, 119 S.Ct. 2240 (1999)............................................21

Am. Ins. Assoc. v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374 (2003). 29, 31, 34, 35

Antilles Cement Corp. v. Fortuno, 670 F.3d 310 (1st Cir. 2012)........ 35, 37, 38, 40

Arizona v. United States, 567 U.S. ____, 132 S.Ct. 2492 (2012) .................... 21, 22

Barclays Bank PLC v. Franchise Tax Bd. of Cal., 512 U.S. 298, 114

    S.Ct. 2268 (1994)...............................................................................................35

Crosby v. National Foreign Trade Council, 530 U.S. 363, 120 S.Ct.

    2288 (2000)............................................................................................... passim

DeKalb Co. School District v. Schrenko, 109 F.3d 680 (11th Cir.

    1997) .................................................................................................................20

Faculty Senate of Florida International University v. Winn, 616 F.3d

    1206 (11th Cir. 2010)................................................................................. passim

Foto USA, Inc. v. Board of Regents of the University System of

    Florida, 141 F.3d 1032 (11th Cir. 1998)...........................................................20

Horton v. City of St. Augustine, Florida, 272 F.3d 1318 (11th Cir.

    2001) .......................................................................................................... 12, 18

Lyes v. City of Riviera Beach, 166 F.3d 1332 (11th Cir. 1999) ...........................21

Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376 (1977)..................................................20

National Foreign Trade Council v. Natsios, 181 F.3d 38 (1st Cir. 1999) ........................................................................ passim

Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of America v. City of Jacksonville, Florida, 896 F.2d 1283 (11th Cir. 1990) ................................................................... 18, 43

Planned Parenthood of Mid-Missouri & Eastern Kansas v. Dempsey, 167 F.3d 458 (8th cir. 1999) ................................................ 20

Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365 (1997) ................................ 21

Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271 (1980) ................................... 36

Regan v. Taxation With Representation of Washington, 461 U.S. 540, 103 S.Ct. 1997 (1983) ........................................................ 19

Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759 (1991) ......................................... 20

Siegel v. Lepore, 234 F.3d 1163 (11th Cir. 2000) ................................................... 43

South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237 (1984) ................................................................. 36, 39, 40

Stanley v. Darlington Co. School District, 84 F.3d 707 (11th Cir. 1996) .............................................................................................. 20

Welsh v. Likins, 550 F.2d 1122 (8th Cir. 1977) .................................................... 21

White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 103 S.Ct. 1042 (1983) ................................................................ 36

Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664 (1968) ..................... 31, 32, 33, 35

## Federal Constitutional Provisions and Statutes

U.S. Const. Art. I, § 8, Cl. 3 ....................................................35

U.S. Const. Art. I, §§ 8-10 ......................................................30

U.S. Const. Art. II, § 2 ............................................................30

22 U.S.C. § 2370 ....................................................................24

22 U.S.C. §§ 6001-6010 ..........................................................24

22 U.S.C. §§ 6021-6091 ........................................ 14, 22, 24, 27

22 U.S.C. §§ 7201-7209 ..........................................................24

28 U.S.C. § 1292(a)(1)..............................................................1

28 U.S.C. §§ 1331, 1343(a), and 1367(a). ..................................1

28 U.S.C. §§ 2201-2202 ........................................................1, 5

42 U.S.C. § 1983......................................................................1, 5

42 U.S.C. § 1988......................................................................1, 5

50 U.S.C. App. § 5(b) ..............................................................24

50 U.S.C. §§ 1701-1706 ..........................................................24

## Federal Regulations

31 C.F.R. Part 515....................................................................24

31 C.F.R. pt. 501, Appendix A, Part II....................................26

31 C.F.R. pt. 501, Appendix A, Part II (A)-(G)........................27

## Florida State Statutes

Section 215.473(1)(c), Florida Statutes (2011) ..........................5

Section 287.135 (9), Florida Statutes.................... 15, 25, 28, 41

Section 287.135(5), Florida Statutes........................................27

Section 287.135, Florida Statutes ................................................................... 4, 5, 26

**Other Authorities**

Chapter 2012-196, Laws of Fla. ...........................................................................1, 4

Chapter 2012-196, Section 2, Laws of Fla ..................................................... passim

Chapter 2012-196, Section 3, Laws of Fla ..............................................................5

# STATEMENT OF JURISDICTION

This is an appeal of an order of the District Court granting a preliminary injunction enjoining the implementation of Chapter 2012-196, Laws of Fla., in an action seeking declaratory and injunctive relief pursuant to 28 U.S.C. Sections 2201-2202 and 42 U.S.C. Section 1983 and costs and attorneys' fees pursuant to 42 U.S.C. Section 1988. The District Court was vested with jurisdiction pursuant to 28 U.S.C. Sections 1331, 1343(a), and 1367(a).

The lower court's Order Granting Preliminary Injunction (D.E. 21)[2] was entered June 25, 2012, and its Opinion Following Order Granting Preliminary Injunction (D.E. 24) was entered on June 29, 2012. The Secretary timely filed his Notice of Appeal (D.E. 27) on July 24, 2012, followed by a Corrected Notice of Appeal (D.E. 29) filed on July 25, 2012. The corrected notice addressed a typographical error in a document reference number in the original notice. This Court has jurisdiction pursuant to 28 U.S.C. Section 1292(a)(1).

---

[2] Citations for record purposes will be to the document number contained in the District Court's Civil Docket and the relevant page numbers. Citations will be in the form: (D.E. 1, pp. 3-6).

## STATEMENT OF THE ISSUES

### I.

Did Odebrecht fail to carry its burden to prove a likelihood of success on the merits of its claims that the Secretary's intended enforcement of the Cuba Amendment would violate the Supremacy Clause, the Foreign Affairs Power, and the Foreign Commerce Clause provisions of the United States Constitution and that the Amendment was inoperative by its own terms?

### II.

Did Odebrecht fail to carry its burden to prove that it would suffer irreparable harm if the Secretary's intended enforcement of the Cuba Amendment was not enjoined?

### III.

Did Odebrecht fail to carry its burden to prove that the harm it would suffer in the absence of an injunction would exceed the harm suffered by the Secretary if the injunction was issued?

IV.

Did Odebrecht fail to carry its burden to prove that enjoining the Secretary's enforcement of the Cuba Amendment would not disserve the public interest?

This appeal arises from an action brought by Odebrecht seeking a declaration that the Chapter 2012-196, Laws of Fla., amendment to Section 287.135, Florida Statutes,[3] violates the Constitution and laws of the United States and injunctive relief barring enforcement of the Amendment. (D.E. 4)  Essentially, the Amendment provides that a company that is engaged in business operations in Cuba or Syria at the time of bidding or submitting a proposal for a new contract or renewal of an existing contract, "is ineligible for, and may not bid on, submit a proposal for, or enter into or renew a contract with an agency or local governmental entity for goods or services of $1 million or more."  Chapter 2012-196, Section 2, Laws of Fla.  The Amendment also requires a company bidding on or renewing such a contract to certify that it does not have business operations in Cuba or Syria.  Id.  If a company submits a false certification, it can be subjected to a civil penalty equal to the greater of $2 million or twice the amount of the contract for which the false certification was submitted and ineligibility to bid on any contract with a state agency or local governmental entity for three years.  Id.  The Cuba Amendment was signed into law on May 1, 2012, and became effective on

---

[3] In order to maintain consistency with the District Court's reference to the amendment, it will be referred to herein as the Cuba Amendment.  As the District Court noted, the Cuba Amendment applies to Syria as well. (D.E. 24, p. 3 n. 2)

July 1, 2012. Chapter 2012-196, Section 3, Laws of Fla. Odebrecht is subject to this statutory prohibition because its parent corporation owns the shares of a subsidiary doing business in Cuba.[4] (D.E. 16, p. 2, n. 1)

## A. Course Of Proceedings

On June 4, 2012, Odebrecht filed its Complaint seeking declaratory and injunctive relief pursuant to 28 U.S.C. Sections 2201-2202 and 42 U.S.C. Section 1983, respectively, as well as costs and attorneys' fees pursuant to 42 U.S.C. Section 1988. (D.E. 1) An Amended Complaint (D.E. 4) and Plaintiff's Motion for Preliminary Injunction and Incorporated Memorandum of Law (D.E. 5) were filed on June 5, 2012. Odebrecht's motion was grounded upon its asserted satisfaction of the criteria for the issuance of a preliminary injunction: (1) substantial likelihood of success on the merits of the case (D.E. 5, pp. 7-17); (2) the movant will suffer irreparable harm in the absence of an injunction (D.E. 5, pp. 17-18); (3) the harm suffered by the movant in the absence of an injunction would exceed the

---

[4] Section 287.135, Florida Statutes, incorporates the Section 215.473(1)(c), Florida Statutes (2011), definition of "Company" which means any sole proprietorship, organization, association, corporation, partnership, joint venture, limited partnership, limited liability partnership, limited liability company, or other entity or business association, including all wholly owned subsidiaries, majority owned subsidiaries, parent companies, or affiliates of such entities or business associations that exists for the purpose of making a profit.

harm suffered by the opposing party if the injunction is issued (D.E. 5, 18-19); and (4) an injunction would not disserve the public interest. (D.E. 5, p. 19)

Odebrecht contended that it was likely to prevail on the merits because the Cuba Amendment is preempted by federal law (D.E. 5, pp. 7-11); the Amendment violates the Foreign Affairs Power (D.E. 5, pp. 11-14); the Amendment violates the dormant Foreign Commerce Clause (D.E. 5, pp. 15-16); and the Amendment is inoperative by its own terms. (D.E. 5, pp. 16-17)  With respect to the irreparable harm requirement, Odebrecht asserted that its irreparable harm resided in its becoming ineligible to bid on state and local government contracts worth $1 million or more; the effect of the Amendment on its ability to partner on important projects with other firms; and the effect of the Amendment on its ability to retain and hire employees. (D.E. 5, 17-18)  Regarding the harm the movant would suffer in the absence of an injunction versus the harm the opposing party would suffer if an injunction did not issue, Odebrecht claimed that it would suffer immediate and irreparable harm if the Secretary attempted to enforce the Cuba Amendment and that the Department would not be harmed by an injunction intended to preserve the status quo while the District Court assessed the Amendment's constitutionality. (D.E. 5, pp. 18-19)  Finally, Odebrecht argued that the public interest would not be harmed by the issuance of a preliminary injunction because the public has an overwhelming interest in the enforcement of the United States Constitution and

because a preliminary injunction would allow for more competition in the procurement process. (D.E. 5, p. 19)

The Secretary filed Defendant's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction on June 14, 2012, and first contended that Odebrecht had not established a likelihood of prevailing on the merits because (A) the Amendment is a routine exercise of Florida's constitutionally protected power to allocate public funds (D.E. 15, pp. 4-5); (B) the Amendment only restricts the use of state funds and resources without interfering with federal law, policy, or foreign affairs (D.E. 15, pp. 5-11); (C) the Amendment does not offend the Federal Foreign Affairs Power (D.E. 15, pp. 11-14); (D) the Amendment does not violate the dormant foreign commerce clause (D.E. 15, 14-15); and (E) the Amendment is not inoperative by its own terms. (D.E. 15, pp. 15-16 )

The Secretary next asserted that Odebrecht had not proven it would suffer imminent irreparable harm as a result of his enforcement of the Amendment because the fact that another firm might be awarded a contract Odebrecht would have bid on is not a sufficient showing of irreparable harm in this circuit and that Odebrecht, who had not successfully bid on a Department contract in fifteen years, failed to show that it would be a serious contender for currently available contracts. (D. E. 15, pp. 16-19)

Turning to the balance of harm to the respective parties, the Secretary contended that the balance weighed in favor of the Department for two reasons. First, in light of Odebrecht's contracting history with the Department, it would be rank conjecture to imagine that the Department's enforcement of the Amendment would harm Odebrecht. (D.E. 15, p. 19)   Second, a preliminary injunction would unquestionably harm the Department's ability to carry out its duty to responsibly allocate limited public resources. Id.

Addressing the public interest requirement, the Secretary argued that an injunction would frustrate the legislatively expressed public interest in not doing business with entities doing business with countries designated by the Federal Government as state sponsors of terrorism.   (D.E. 15, p. 20)   Although acknowledging that the Department also had a public interest in getting the best price for public works projects, the Secretary contended that issuance of the injunction would not significantly serve that interest given that Odebrecht was the Amendment's only challenger and had not been a serious contender for Department contracts in years.  Id.

Odebrecht filed its Reply Memorandum in Support of Plaintiff's Motion for Preliminary Injunction (D.E. 16) on June 18, 2012, and Odebrecht's motion was heard and granted on June 25, 2012. (D.E. 21, 22)  Essentially, the District Court found that Odebrecht had carried its burden of satisfying the requisite criteria for

the issuance of a preliminary injunction. (D.E. 21) The District Court's Opinion Following Order Granting Preliminary Injunction (D.E. 24) was entered on June 29, 2012.

The Secretary filed his Answer and Affirmative Defenses to Amended Complaint on July 20, 2012, (D.E. 26) and his Notice of Appeal was filed on July 24, 2012. (D.E. 27) A Corrected Notice of Appeal (D.E. 29) was filed on July 25, 2012.

## B. Statement Of The Facts

Odebrecht is a Florida Corporation that maintains its principal place of business in Coral Gables, Florida. (D.E. 24, p.2) It provides construction and engineering services with a focus on public infrastructure and transportation projects. (D.E. 5, p. 6) Although Odebrecht contends that it has never engaged in business operations in Cuba, its parent corporation, Odebrecht, S. A., is a Brazilian corporation whose subsidiary, COI Overseas Ltd., is involved in a construction project to expand the Cuban Port of Mariel. (D.E. 24, p. 2)

While the District Court noted that over the years agencies of the State of Florida and local governments had awarded Odebrecht thirty five projects amounting to approximately $3.9 billion, (D.E. 24, p. 2) the record also reflects that only nine of those projects were Department projects and that Odebrecht had

not successfully bid on a Department contract in fifteen years. (D.E. 5, Exhibit 1-A; D.E. 15, Exhibit B, paragraph 4)  In 2011, all of Odebrecht's revenue, some $214.5 million, was derived from public infrastructure and transportation projects and Broward County recently awarded Odebrecht a $226 million contract to renovate the Fort Lauderdale Airport. (D.E. 24, p. 2)  Odebrecht claims that beginning in July 2012, it intends to bid on or pursue five Department projects this year valued at approximately $3.4 billion.[5] (D.E. 4, p. 8; D.E. 5, Exhibit 1, pp. 8-9)

Odebrecht also averred that it has already suffered actual injury in that: "OCI's ability to form relationships with potential partners, subcontractors, suppliers and designers for projects to be bid is being adversely affected, as well as OCI's ability to retain and hire employees.  Based on the anticipated effective date of the Cuba Amendment, such entities and persons have raised concerns about whether to team with OCI for purposes of pursuing contracts with the State of Florida agencies and local governments for which bids on and proposals for are not due until after July 1, 2012, the effective date of the Cuba Amendment." (D.E. 5, Exhibit 1, p. 5)  However, Odebrecht did not identify any of the potential partners, subcontractors, suppliers, or designers for a specific project who had voiced concerns nor did it provide a specific example of an employee it could not retain or

_____

[5]  The Department assigned Odebrecht a maximum capacity rating of $1.873 billion which means that if Odebrecht had no other ongoing projects, it could bid on approximately $1.873 billion worth of Department projects. (D.E. 16, Exhibit 4, p. 4, Exhibit 4-B)

potential employee who refused employment due to the effect of the anticipated Cuba Amendment.

The Florida Department of Transportation (Department) is a decentralized agency charged with coordinating, maintaining, and regulating public transportation in the State of Florida. (D.E. 24, p. 3) The Department's subdivisions are responsible for acquiring commodities and contractual services under the guidance and direction of the Secretary. Id. The Secretary is charged with implementing and enforcing the Cuba Amendment with respect to Department contracts valued at $1 million or more. Id. The record is silent with respect to the specific (or for that matter average) annual total amount of Department contracts at issue or the number of entities that potentially could be affected by the Secretary's enforcement of the Amendment. By letter dated June 4, 2012, Odebrecht was advised by the Department's General Counsel that the Department intended to implement the Cuba Amendment effective July 1, 2012. (D.E. 5, Exhibit 2)

## C. Standard Of Review

When reviewing a district court's entry of a preliminary injunction, this Court reviews findings of fact under a clearly erroneous standard, and conclusions of law de novo. Horton v. City of St. Augustine, Florida, 272 F.3d 1318, 1326

(11th Cir. 2001).  The grant or denial of a preliminary injunction will be reversed only upon a showing of an abuse of discretion.  <u>Id.</u>

The District Court erroneously concluded that Odebrecht carried its burden of showing satisfaction of each of the requirements for the issuance of a preliminary injunction. With respect to Odebrecht's likelihood of prevailing on the merits the District Court determined that there was a substantial likelihood that the Cuba Amendment would be found unconstitutional under the Supremacy Clause, the Federal Foreign Affairs Power, and the Foreign Commerce Clause, and that it was highly likely that the Cuba Amendment is inoperative by its own terms.

Florida's exercise of its spending power through the Cuba Amendment did not violate the Supremacy Clause on the basis of either conflict or field preemption. The Amendment does not impose an economic sanction against Cuba and its provisions are not perpetual. Florida's enactment of the Amendment was not based upon its unilateral assessment and characterization of Cuba. The federal government had already placed Cuba on the list of state sponsors of terrorism.

No portion of the Amendment flatly prohibits trade with Cuba and then backs the trade prohibition up with a penalty regimen. Nor does the Amendment prohibit foreign entities doing business with any of the four countries identified in the Amendment from doing business in the Florida private sector or anywhere else in the United States. Although the Amendment provides for a monetary civil

penalty and a three-year bidding restriction, those penalties are only sanctions for submitting a false certification of a firm's lack of business operations with Cuba and not for engaging in trade with Cuba.

Further, the Amendment does not interfere with the President's directive under the Libertad Act (22 U.S.C. Sections 6021-6091) and other federal statutes to foster democracy and assist a democratically elected government in Cuba. By its own terms the Amendment's provisions addressing Cuba would become inoperative in the event the federal government, for purposes of fostering growth of a democratic government in Cuba, elected to remove Cuba from the list of states sponsoring terrorism and relax or eliminate the sanctions associated with that designation.

Operation of the Amendment is not barred by field preemption. It does not trespass upon an area occupied by the federal government because nothing in the federal sanctions regime evinces a desire on the part of the federal government to foster trade with Cuba by foreign entities, nor is there any evident federal policy encouraging access by these entities to state and local government funds through the competitive procurement process.

The Cuba Amendment does not collide with the Foreign Affairs Power because it has not afforded Florida state courts and administrative tribunals a vehicle for inquiring into, or making comment upon, the nature and functioning of

the Cuban government or its courts, or for calling into question the credibility of Cuban diplomats or other government officials. Florida has not established its own foreign policy toward Cuba through the Amendment. Whether the Amendment is in effect or not, the federal sanctions regime has placed foreign companies in the position of making decisions about pursuing trade with Cuba.

The Cuba Amendment does not run afoul of the dormant Foreign Commerce Clause by virtue of the market participant doctrine. Florida's procurement activities involve the purchase of goods and services in a global market place where it competes with both the public and private sector, domestically and internationally. In determining who it will do business with in that market, Florida is not imposing regulations outside of the market. It is instead acting as any private company would act.

The Cuba Amendment is not inoperative by its own terms. Section 287.135 (9), Florida Statutes, as amended by Chapter 2012-196, Section 2, Laws of Fla., provides: "This section becomes inoperative on the date that federal law ceases to authorize the states to adopt and enforce the contracting prohibitions of the type provided for in this section." This clause should be read to mean that, in the event the Secretary of State removes one of the countries affected by the Amendment from the State Sponsors of Terrorism list, the contracting prohibitions in the Amendment would no longer be enforceable.

Turning to the second requirement for a preliminary injunction, Odebrecht failed to demonstrate that it would suffer irreparable harm if the Secretary's enforcement of the Amendment was not enjoined. The harm Odebrecht attributes to the loss of its right to compete for state contracts and the loss of revenues and profits from such contracts, is based on an assumption, without an affirmative averment on the record, that Odebrecht, S. A., will elect to continue doing business in Cuba and thus subject Odebrecht to the Amendment's procurement restrictions.

Even if Odebrecht is subject to the procurement restrictions, a finding of harm as a result of the Secretary's enforcement of the Amendment necessarily assumes that Odebrecht would be the successful bidder on the Department contracts it intends to pursue. Odebrecht has not successfully bid on a Department contract in fifteen years. Any harm Odebrecht would attribute to its inability to bid on Department contracts and any attendant loss of revenues and profits are entirely speculative.

Similarly grounded in speculation is Odebrecht's contention that the potential enforcement of the Cuba Amendment has already interfered with its ability to partner with other firms and hire and retain employees. There is no record identification of any of the potential partners, subcontractors, suppliers, or designers for a specific project who had voiced concerns nor is there a specific

example of an employee Odebrecht could not retain or a potential employee who refused employment due to the anticipated effect of the Cuba Amendment.

Odebrecht cannot meet the third requirement for a preliminary injunction because its asserted, but not demonstrated, potential injury resulting from the Secretary's enforcement of the Cuba Amendment does not outweigh the harm to the pursuit of a legitimate state interest an injunction would produce. Although the federal Cuban sanctions regime is broad, it leaves room for the State of Florida to legislatively control the expenditure of public procurement funds through proscriptions directed to entities doing business with Cuba. The federal scheme in the absence of the Amendment does not address this legitimate state concern.

Finally, a preliminary injunction would disserve the public interest. The Secretary's enforcement of the Cuba Amendment will not thwart the maintenance of a unified federal policy toward Cuba but would instead foster a legitimate state interest in not expending public funds to procure goods and services from entities doing business with a state sponsor of terrorism. A preliminary injunction would bar pursuit of that interest through validly enacted legislation.

# ARGUMENT

## ODEBRECHT FAILED TO ESTABLISH ITS SATISFACTION OF THE CRITERIA WARRANTING THE ISSUANCE OF A PRELIMINARY INJUNCTION.

A district court may grant a preliminary injunction only upon the movant's showing that (1) it has a substantial likelihood of success on the merits; (2) the movant will suffer irreparable injury unless the injunction is issued; (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party; and (4) if issued, the injunction would not disserve the public interest. Horton, 272 F.3d at 1327. "It is well established in this circuit that '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to all four elements." Id. This burden is at all times upon the movant. Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of America v. City of Jacksonville, Florida, 896 F.2d 1283, 1285 (11th Cir. 1990). Moreover, "preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits— must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." Id.

The District Court erroneously found for Odebrecht on each of the four preconditions for a preliminary injunction. (D.E. 21, 24)

> ### A. The Cuba Amendment Does Not Violate The United States Constitution With Respect To The Supremacy Clause, The Foreign Affairs Power, Or The Foreign Commerce Clause, Nor Is The Amendment Inoperative By Its Own Terms.

The District Court concluded that there was a substantial likelihood that the Cuba Amendment would be found unconstitutional under the Supremacy Clause, the Federal Foreign Affairs Power, and the Foreign Commerce Clause. (D.E. 24, p. 23) The lower court also found that it was highly likely that the Cuba Amendment is inoperative by its own terms. (D.E. 24, p. 21) Analysis of controlling authority, the meager factual development reflected in the instant record, and the plain language of the Amendment reveals that the District Court was mistaken in both respects.

### 1. The Supremacy Clause

Courts have routinely held that both the States and the federal government have broad discretion in allocating their funds, including decisions not to fund certain activities. See, e.g., Regan v. Taxation With Representation of Washington, 461 U.S. 540, 550, 103 S.Ct. 1997, 2003 (1983) (federal government can refuse to provide tax exemptions for nonprofit organizations that engage in

lobbying activities, while granting tax-exempt status to nonprofits that do not); Maher v. Roe, 432 U.S. 464, 477, 97 S.Ct. 2376, 2384 (1977) (States have no legal obligation to subsidize non-therapeutic abortions); Foto USA, Inc. v. Board of Regents of the University System of Florida, 141 F.3d 1032, 1037 (11th Cir. 1998) ("[T]he state, as a purchaser of services, enjoys a broad freedom to deal with whom it chooses on such terms as it chooses….At least in the absence of an invidious and discriminatory design to favor one individual over another, a state agency's purchasing decision is not subject to review in federal court.").  A State may selectively sponsor or subsidize programs that it believes to be in the public interest and may decline to subsidize other programs.  See Rust v. Sullivan, 500 U.S. 173, 193, 111 S.Ct. 1759, 1772 (1991); Planned Parenthood of Mid-Missouri & Eastern Kansas v. Dempsey, 167 F.3d 458, 461 (8th Cir. 1999).

When allocating public funds, State governments exercise a basic attribute of their sovereignty.  See DeKalb Co. School District v. Schrenko, 109 F.3d 680, 689-690 (11th Cir. 1997) ("A state's power to create, abolish, and determine the level of public funding of political subdivisions has long been recognized as an element of state sovereignty.")  Indeed, "[n]o right of a state is entitled to greater respect by the federal courts than the state's right to determine how revenues should be raised and how and for what purpose public funds should be expended." Welsh v. Likins, 550 F.2d 1122, 1131-1132 (8th Cir. 1977).  Accordingly, State

legislative determinations as to funding for public bodies are entitled to "great deference." Lyes v. City of Riviera Beach, 166 F.3d 1332, 1344 (11th Cir. 1999). See also Stanley v. Darlington Co. School District, 84 F.3d 707, 716 (11th Cir. 1996) ("It would be an unfathomable intrusion into a state's affairs—and a violation of the most basic notions of federalism—for a federal court to determine the allocation of a state's financial resources. The legislative debate over such allocation is uniquely an exercise of state sovereignty."). A contrary conclusion would afford insufficient respect to the constitutional role of state sovereignty in the federal scheme. See, e.g., Alden v. Maine, 527 U.S. 706, 751, 119 S.Ct. 2240, 2264-2265 (1999); Printz v. United States, 521 U.S. 898, 928, 117 S.Ct. 2365, 2381 (1997). See also Arizona v. United States, 567 U.S. ____, 132 S.Ct. 2492, 2500 (2012) ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.").

However:

> From the existence of two sovereigns follows the possibility that laws can be in conflict or at cross-purposes. The Supremacy Clause provides a clear rule that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."...Under this principle, Congress has the power to preempt state law. [Citations omitted]

Id.  Preemption under the Supremacy Clause occurs expressly, or where state law conflicts with federal law (conflict preemption), or it can be inferred from pervasive, dominant federal regulation of particular conduct (field preemption). Arizona, 132 S.Ct. at 2500-2501.

The District Court found that Florida's exercise of its spending power through the Cuba Amendment violated the Supremacy Clause on the basis of both conflict and field preemption.  Relying primarily upon Crosby v. National Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288 (2000), the District Court first concluded that the Amendment conflicted with the federal Cuba sanctions regime because (1) the Cuba Amendment frustrates the President's discretion to carefully calibrate sanctions against Cuba in accordance with U.S. foreign policy objectives (D.E. 24, pp. 11-12); (2) the Cuba Amendment regulates a broader set of entities and activities than federal law and imposes different penalties (D.E. 24, p. 12); and (3) the Cuba Amendment interferes with the President's directive under the Libertad Act (22 U.S.C. Sections 6021-6091) and other federal statutes to foster democracy and assist a democratically elected government in Cuba. (D.E. 24, pp. 12-13)  In addition to conflict preemption, the District Court concluded that Congress had clearly intended to "occupy the field" by virtue of federal law having regulated all aspects of commerce with Cuba. (D.E. 24, p. 14)

Crosby is materially distinguishable and does not compel a finding of federal preemption in this case. At the time National Foreign Trade Council (NFTC), the respondent in Crosby, filed its complaint, National Foreign Trade Council v. Natsios, 181 F.3d 38, 48 (1st Cir. 1999), the Massachusetts law had been in effect for approximately two years. Id. at 45. As a result, a record was developed showing that there were 346 companies on Massachusetts' restricted purchase list. Id. at 47. Thirty-four NFTC members were on the most recent restricted purchase list, three of NFTC's members had withdrawn from Burma after passage of the Massachusetts law, and another NFTC member had a bid for a procurement contract in Massachusetts increased by ten percent pursuant to the law. Crosby, 530 U.S. at 371-372, 120 S.Ct. at 2293. Moreover, the Massachusetts act targeted Burmese companies as well as other foreign and domestic companies and, among other things, prevented the expenditure (with limited exceptions) of any portion of Massachusetts' $2 billion-plus[6] procurement budget for purchases of goods and services from Burma. Crosby, 530 U.S. at 367, 120 S.Ct. at 2291.

Here, the Cuba Amendment had not gone into effect at the time Odebrecht filed its amended complaint on June 5, 2012. While the amendment will place Odebrecht, S. A., in the position of having to decide whether to do business with

---

[6] Natsios, 181 F.3d at 46.

Cuba or with Florida, nothing on the face of the record suggests, much less demonstrates, that this aspect of the Amendment's operation imposes an economic sanction against Cuba. There is no record evidence indicating that Odebrecht, S. A., or any other similarly situated foreign company is likely to opt to do business with Florida rather than Cuba, nor is there any record evidence regarding the impact, if any, the operation of the Amendment would have on Cuba's ability to secure contractors and commodities in the world market. Any ability of Cuba to pursue a Florida public sector market for its products or services through any channel is not impacted by the act. The federal sanctions regime foreclosed that ability long ago. <u>See</u> the Trading with the Enemy Act of 1917, 50 U.S.C. App. Section 5(b); the Foreign Assistance Act of 1961, 22 U.S.C. Section 2370; the International Emergency Economic Powers Act of 1977, 50 U.S.C. Sections 1701-1706; the Cuban Democracy Act of 1992, 22 U.S.C. Sections 6001-6010; the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. Sections 6021-6091; the Trade Sanctions Reform and Exports Enhancement Act of 2000, 22 U.S.C. Sections 7201-7209; the Cuban Assets Control Regulations, 31 C.F.R. Part 515. As was the case with the statute in issue in <u>Faculty Senate of Florida International University v. Winn</u>, 616 F.3d 1206, 1210 (11th Cir. 2010), nothing in the instant record shows that the practical impact of the amendment can be economically great on Cuba or any other countries.

An additional aspect of the Massachusetts act the Supreme Court focused on in its preemption analysis was the fact that the state sanctions were immediate, and perpetual, there being no termination provision.  Crosby, 530 U.S. at 376-377, 120 S.Ct. at 2296.  The Court concluded that "[t]his unyielding application undermines the President's authority by making it impossible for him to restrain fully the coercive power of the national economy when he may choose to take the discretionary action open to him, whether he believes that the national interest requires sanctions to be lifted, or believes that the promise of lifting sanctions would move the Burmese regime in the democratic direction."  Crosby, 530 U.S. at 377, 120 S.Ct. at 2296.  The Cuba Amendment does not share the same shortcoming.

Although the Department expressed its intent to implement the Cuba Amendment's certification requirement when the statute became effective, the Amendment, unlike the Massachusetts act, contains a termination clause that provides:  "This section becomes inoperative on the date that federal law ceases to authorize the states to adopt and enforce the contracting prohibitions of the type provided for in this section."  §287.135 (9), Fla. Stat., as amended by Ch. 2012-196, §2, Laws of Fla.  The Cuba Amendment's provisions addressing Cuba would no longer be applicable should the federal government elect to remove Cuba from

the list of states sponsoring terrorism and relax or eliminate the sanctions associated with that designation.

Another distinction of <u>Crosby</u> recognized by this Court in <u>Faculty Senate</u>, is applicable here as well. Unlike the Massachusetts act at issue in <u>Crosby</u>, Florida's enactment of the Amendment did not "unilaterally select by name a foreign country on which it has declared, in effect, some kind of economic war." <u>Faculty Senate</u>, 616 F.3d at 1210. Cuba was already on the list of state sponsors of terrorism. <u>Id.</u> at 1210-1211. Through Section 287.135, Florida Statutes, as amended by Chapter 2012-196, Section 2, Laws of Fla., the Legislature determined that public funds would not be expended to do business with firms doing business with state sponsors of terrorism.

<u>Crosby</u> does not mandate a finding of conflict preemption in this case because the record lacks any showing that the Cuba Amendment imposes an economic sanction on Cuba; the Cuba Amendment is not plagued by the intractability embodied in the Massachusetts act; and Florida, rather than unilaterally develop its own foreign policy, has instead followed the federal government's lead.

The District's Court second ground for finding the Cuba Amendment in conflict with federal law was its conclusion that the Cuba Amendment regulates a broader set of entities and activities than federal law and imposes different

penalties. (D.E. 24, p.12)   The District Court is mistaken in both regards.   First, unlike the federal scheme (31 C.F.R. pt. 501, Appendix A, Part II), no portion of the Cuba Amendment flatly prohibits trade with Cuba and then backs the trade prohibition up with a penalty regimen.   Nor does the Amendment prohibit foreign entities doing business with any of the four countries identified in the Amendment from doing business in the private sector in Florida or anywhere else in the United States.

Second, in its analysis, the District Court looked to the civil penalty and the three-year bidding restriction imposed for violations of the Amendment and noted that "[t]hese penalties are markedly different from the penalties administered by OFAC for violation of federal law."  (D.E. 24, p. 12)   The penalties are indeed different, but, they are directed to different conduct.  The OFAC penalties apply to various proscribed financial transactions and business operations regarding trade with the subject countries. <u>See</u> 31 C.F.R. pt. 501, Appendix A, Part II (A)-(G). The monetary civil penalty and three-year bidding restriction provided in the Cuba Amendment do not penalize any aspect of trade with Cuba.   Instead, they only impose penalties for an entity's submission of a false certification that it does not have business operations in Cuba.  <u>See</u> § 287.135(5), Fla. Stat., as amended by Ch. 2012-196, § 2, Laws of Fla.

As a final point of conflict with federal law the District Court concluded that the Cuba Amendment interferes with the President's directive under the Libertad Act (22 U.S.C. §§ 6021-6091) and other federal statutes to foster democracy and assist a democratically elected government in Cuba. (D.E. 24, pp. 12-13) This concern is obviated by virtue of the Amendment's termination clause noted above. See §287.135 (9), Fla. Stat., as amended by Ch. 2012-196, §2, Laws of Fla. By its own terms the Amendment's provisions addressing Cuba would become inoperative in the event the federal government, for purposes of fostering growth of a democratic government in Cuba, elected to remove Cuba from the list of states sponsoring terrorism and relax or eliminate the sanctions associated with that designation.

With respect to field preemption the District Court noted that "[f]ederal law regulates all aspects of commerce with Cuba, including but not limited to the importation and exportation of various goods and services, travel between the United States and Cuba, and private rights of action against the Cuban government." (D.E. 24, p. 14) The lower court then concluded that "[b]ecause the Cuba Amendment frustrates the 'balanced, tailored approach' of the federal scheme, . . . the Cuba Amendment is likely unconstitutional." Id. (citation omitted).

In Faculty Senate, this Court upheld Florida's statutory ban on expending state funds for travel to Cuba notwithstanding the fact that travel to Cuba had been, and continued to be, subject to federal regulation. 616 F.3d at 1208-1209. After noting that the Secretary viewed the Faculty Senate opinion as controlling on the issue of field preemption in this case, the District Court determined that Faculty Senate was "distinguishable for many reasons." (D.E. 24, p. 14) However, the only reason articulated by the lower court was this Court's distinction of the Florida statute at issue in Faculty Senate and the Massachusetts act at issue in Crosby (where the obvious intent was to reduce trade across the board with Burma) on the basis that the Florida statute did not attempt to prohibit, or even to obstruct, trading broadly by anyone with anyone. (D.E. 24, pp. 14-15)

Having primarily relied upon this distinction, the District Court overlooked one significant aspect of Faculty Senate. In concluding that powerful evidence of a clear and express foreign policy like that in American Insurance Association v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374 (2003), was absent in Faculty Senate, this Court pointed to the fact that the record did not show "that a definite substantive foreign policy position exists in favor of academic travel—much less in favor of travel to countries that sponsor terrorism—that could be undermined by Florida's Act." Faculty Senate, 616 F.3d at 1211. Here, the Cuba Amendment would bar the expenditure of state and local procurement funds to acquire goods

and services from entities trading with Cuba.  Like the Florida statute at issue in Faculty Senate, the Amendment does not infringe upon an area occupied by the federal government because nothing in the federal sanctions regime evinces a definite substantive foreign policy position on the part of the federal government to foster trade with Cuba by such entities, nor is there any evident federal policy encouraging access by these entities to state and local government funds through the competitive procurement process.  Faculty Senate is apposite and compels a conclusion that the Cuba Amendment does not collide with field preemption principles.

### 2.  The Foreign Affairs Power

The federal government's Foreign Affairs Power resides primarily in Article I, Sections 8-10, and Article II, Section 2 of the United States Constitution.  These provisions "have been long understood to stand for the principle that power over foreign affairs is vested exclusively in the federal government."  Natsios, 181 F.3d at 50.  But, "[f]ederal dominion over foreign affairs does not mean that there is no role for the states."  Id.  "[S]ome degree of state involvement in foreign affairs is inevitable."  Id.  Thus, for a state statute to encroach on the federal government's Foreign Affairs Power, it must have more than "some incidental or indirect effect in foreign countries," and have the potential for diplomatic "disruption or

embarrassment." Zschernig v. Miller, 389 U.S. 429, 434-435, 88 S.Ct. 664, 667

(1968). State law must also give way where there is evidence of clear conflict

between the policies adopted by the state and federal governments. Garamendi,

539 U.S. at 421, 123 S.Ct. at 2390.

As the District Court noted, the First Circuit, in Natsios, set out a five-factor

test for determining when a statute's effect on foreign countries is more than

incidental or indirect, to-wit: (1) the design and intent of the law; (2) the amount

of purchasing power the law effected; (3) the possibility of other states following

the example; (4) the protests lodged by other foreign countries; and (5) the

differences between the state and federal approaches. (D.E. 24, p. 15, n. 9) See

181 F.3d at 53. After recognizing that this Court had not employed the Natsios

criteria in its analysis of the Foreign Affairs Power issue in Faculty Senate, the

District Court eschewed application of the criteria in this case. Instead, the lower

court looked to Zschernig and concluded:

> It is sufficient to hold that the Cuba Amendment likely
> violates the general criteria established in Zschernig v.
> Miller, which is to say, the Cuba Amendment has more
> than incidental or indirect effect on foreign countries and
> has the potential for diplomatic disruption or
> embarrassment. The Cuba Amendment forces foreign
> companies to choose between doing business with
> Florida and lawful business with Cuba. This affects not
> only Cuba, but governments that transact with Cuba and
> Florida, including Brazil and Canada. Such is the case
> here. Plaintiff's parent company is involved in a project
> to expand the Cuban port of Mariel. As noted, the
> project, at a cost of nearly $1 billion, is funded
> substantially by the Brazilian Development Bank.

> Indeed, Brazil has already protested the Cuba Amendment….Foreign relations involve the delicate balancing of issues, and the Cuba Amendment, the effect of which is exacerbated by the State of Florida's traditional role as a flashpoint of United States-Cuba foreign policy, clearly possesses the potential to disrupt the federal government's handling of these issues. [Citations to newspaper articles and related parentheticals omitted]

(D.E. 24, pp. 16-17)

Zschernig involved an Oregon statute which provided for escheat in cases where a nonresident alien claimed real or personal property unless the following three requirements were met: (1) the existence of a reciprocal right of a United States citizen to take property on the same terms as a citizen or inhabitant of the foreign country; (2) the right of United States citizens to receive payment here of funds from estates in the foreign country; and (3) the right of foreign heirs to receive the proceeds of Oregon estates without confiscation. 389 U.S. at 430-431, 88 S.Ct. at 665. Addressing the reciprocity requirement of the Oregon statute and similar statutes of other states the Supreme Court observed:

> It now appears that in this reciprocity area under inheritance statutes, the probate courts of various States have launched inquiries into the type of governments that obtain in particular foreign nations—whether aliens under their law have enforceable rights, whether the so-called 'rights' are merely dispensations turning upon the whim or caprice of government officials, whether the representations of consuls, ambassadors, and other representatives of foreign nations is credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation.

32

Zschernig, 389 U.S. at 433-434, 88 S.Ct. at 667.  The Court further noted that this "element of confiscation" had "led into minute inquiries concerning the actual administration of foreign law, into the credibility of foreign diplomatic statements, and into speculation whether the fact that some received delivery of funds should 'not preclude wonderment as to how many may have been denied the right to receive.'"  389 U.S. at 435, 88 S.Ct. at 668.  Ultimately, the Supreme Court refused to uphold the Oregon statute concluding that it illustrated "the dangers which are involved if each State, speaking through its probate courts, is permitted to establish its own foreign policy."  Zschernig, 389 U.S. at 441, 88 S.Ct. at 671.

Here, on the other hand, the Cuba Amendment has not afforded Florida state courts and administrative tribunals a vehicle for inquiring into, or making comment upon, the nature and functioning of the Cuban government or its courts, or for calling into question the credibility of Cuban diplomats or other government officials.  Put simply, Florida has not established its own foreign policy toward Cuba.  That call has already been made by the federal government.  Just as this Court stated in Faculty Senate:

> But unlike the Oregon statute and practice in *Zschernig*, Florida is not asking in its Act—even in the Act's application—for proof about the conduct of any foreign government or making a judgment about that conduct which is apart from the federal government's own announced judgment.  *See id.* at 667.  Florida accepts altogether the list published by the Executive Branch of the United States.  Florida in this Act does not entangle itself with foreign law or foreign officials.  The potential

33

> for embarrassment to the federal government, *see id.*, that
> could come from all that is lacking here.

616 F.3d at 1211.

This state of affairs certainly goes a long way toward explaining the absence of any protest from the federal government in the instant record. In stark contrast to its resounding silence in this case, the federal government has not hesitated to take umbrage with state legislation it perceives as negatively impacting major foreign policy considerations. See <u>Garamendi</u>, 539 U.S. at 411-412, 123 S.Ct. at 2384-2385 (quoting correspondence from Deputy Secretary of the Treasury Eizenstat to the California Governor and to the insurance commissioner regarding the negative impact of a California insurance statute on the federal government's efforts to secure processing of unpaid insurance claims from the Holocaust period).

As a final point, the District Court's determination gains no support from its observation that the Amendment affects not only Cuba, but governments that transact with Cuba and Florida. Suffice it to say that this has been the case since the Cuban trade embargo and related sanctions were imposed by the federal government. With or without the Cuba Amendment being in effect, the federal sanctions regime has placed foreign companies in the position of making decisions about pursuing trade with Cuba. For example, even if the Amendment was not in effect, a foreign entity could not sell lawfully purchased Cuban commodities in the

Florida public or private sector.   If the foreign entity wished to sell such commodities in Florida, it would have to find another source.

Like the ban on expending state funds for travel to Cuba upheld in <u>Faculty Senate</u>, the operation of the Cuba Amendment vis-a-vis the federal government's Foreign Affairs Power is not constitutionally offensive under <u>Zschernig</u> or, for that matter, <u>Garamendi</u>.

### 3.  The Foreign Commerce Clause

The Commerce Clause, Article I, Section 8, Clause 3 of the United States Constitution, provides that Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." "[T]he Clause not only gives Congress the express power to regulate commerce but also implicitly protects against state laws inimical to foreign or national trade." <u>Antilles Cement Corp. v. Fortuno</u>, 670 F.3d 310, 326 (1st Cir. 2012) (citing <u>Barclays Bank PLC v. Franchise Tax Bd. of Cal.</u>, 512 U.S. 298, 114 S.Ct. 2268 (1994)).[7]  "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce."   <u>South-Central</u>

---

[7] In the context of foreign commerce, this implicit aspect of the Commerce Clause is generally referred to as the dormant Foreign Commerce Clause.  <u>Id.</u>

Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87, 104 S.Ct. 2237, 2240 (1984). However, a state is not subject to the restraints of the Commerce Clause when it acts as a participant in the free market as opposed to a sovereign regulating the market. See White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 208, 103 S.Ct. 1042, 1044 (1983) ("when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause"); Reeves, Inc. v. Stake, 447 U.S. 429, 437, 100 S.Ct. 2271, 2278 (1980) ("no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market").

Below, the Secretary relied upon the market participant exception and argued that the Cuba Amendment did not violate the dormant Foreign Commerce Clause because it governed the Department's direct participation in the market. (D.E. 15, pp. 14-15)  In rejecting the Secretary's argument the District Court at first appeared to suggest that the market participant exception may not apply to the Foreign Commerce Clause. (D.E. 24, pp. 19-20)  The lower court then concluded that even if the exception is applicable to the Foreign Commerce Clause, the Cuba Amendment does not satisfy the exception because the Amendment "uses Florida's leverage in the public contracting market (in which it does participate) to exert an effect on the market consisting of companies engaging in lawful trade with Cuba (in which it does not participate)." (D.E. 24, 20)

In a case presenting an issue of first impression with respect to the operation of the market participant exception, the First Circuit held that a state cannot violate the dormant Foreign Commerce Clause when acting as a market participant. Antilles Cement, 670 F.3d at 328-329. Prior to the court's decision, the market participant exception had been recognized by the Supreme Court only in cases implicating the dormant Interstate Commerce Clause. Id. at 327. Nevertheless, the court concluded that a state may discriminate against foreign commerce when it participates in the free market. Id. at 328.

The First Circuit's analysis leading to this result is particularly apposite to the case at bar. Looking first to the fact that the Supreme Court had "frequently employed sweeping language to the effect that the Commerce Clause in its entirety does not apply to market participants[,]" Antilles Cement, 670 F.3d at 328, the court reasoned that:

> …extending the market participant exception to the context of foreign commerce is consistent with the purposes undergirding the exemption. As the court has explained, the exception recognizes that a state that delves into the free market is akin to a private business— and the law has long respected the unfettered discretion of private businesses to deal with whomever they please….This makes perfect sense. After all, a state that participates in the market is burdened by the same regulations as private companies….To ensure a level playing field, "when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause."…While these principles have been developed in the interstate commerce context, they apply with equal force when a state-proprietor discriminates

against foreign commerce. Private businesses are permitted to refuse to deal with foreign companies, and so states, acting as market participants, deserve the same leeway. [Citations and attendant parentheticals omitted]

Id. at 328-329.

As the First Circuit saw it, "[a] contrary rule would lead to anomalous results." Antilles Cement, 670 F.3d at 329. "Indeed, any law that discriminates against out-of-state companies necessarily impedes both interstate and foreign commerce." Id. "The Supreme Court has repeatedly relied on the market participant doctrine to uphold discriminatory laws against Commerce Clause challenges with respect to interstate commerce." Id. "If the market participant exception cannot also excuse barriers to foreign trade, however, then all of these laws would be suspect and the Supreme Court's forging of the market participant doctrine would have been little more than an exercise in futility." Id.

In the final analysis, the First Circuit could "see no reason why a state participating in the market should not be permitted to choose with whom it does business." Id. at 329. "The dormant Foreign Commerce Clause exists to ensure that the United States speaks with a unified voice when it engages in foreign trade." Id. "**A particular state's refusal, as a market participant, to transact business with a foreign company does not undermine the cohesiveness of our national trade policy; it merely removes one entry from the foreign company's customer list.**" Id. (emphasis added).

Particularly noteworthy is the First Circuit's response to the concern, noted in Natsios,[8] that foreign countries will view a state-proprietor's decision not to do business with them as a trade barrier erected by the United States and will seek to retaliate against the nation as a whole. Id. The court defused this concern, stating:

> But this fear makes sense only when discussing state regulations that burden trade between foreign companies and **private entities** within the state. If such laws were permitted, foreign countries would face a confusing array of protectionist state regulations and, as a result, might either eschew trade with the United States or erect their own barriers to American products. But when a state-proprietor chooses to transact business with only domestic entities, foreign companies face "no problems of reconciling conflicting policy among multiple national sovereigns." *Trojan Techs.*, 916 F.2d at 912. The companies can still do business anywhere in the United States under the same terms; they simply cannot contract with the government of the state that enacted the protectionist statute. [Emphasis added]

Id.

Having resolved the applicability of the market participant exception to the dormant Foreign Commerce Clause, the only question remaining is whether the District Court correctly concluded that the State was acting as a regulator rather than a market participant. The Secretary submits that it did not act as a regulator.

In arriving at its conclusion, the District Court looked to the following language from the Supreme Court's opinion in Wunnicke:

> Contrary to the State's contention, the [market participant] doctrine is not carte blanche to impose any

---

[8] 181 F.3d at 66.

conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity….

The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market. [Citation and footnote omitted]

467 U.S. 82, 97, 104 S.Ct. 2237, 2245 (1984)

In other words, a state cannot employ the market participant doctrine to immunize its down-stream regulation of a market in which it is not a participant. Wunnicke, 467 U.S. at 99, 104 S.Ct. at 2246.

Based upon its definition of the relevant market, the District Court concluded that the Cuba Amendment had "exactly the downstream effect the market participant doctrine forbids." (D.E. 24, p. 20) The lower court's conclusion is erroneous because it was grounded upon too narrow of a definition of the market within which Florida participates. Rather than the domestic "public contracting market," Florida's procurement activities involve the purchase of goods and services in a global market place where it competes with both the public and private sector, domestically and internationally. In determining who it will do business with in that market, Florida is not imposing regulations outside of the market. It is instead acting as any private company would act.

Moreover, like the Puerto Rican statute upheld in <u>Antilles Cement</u>, the Cuba Amendment "does not undermine the cohesiveness of national trade policy." 670 F.3d at 329. A company lawfully doing business with Cuba can still do business in the public and private sectors anywhere in the United States. The Cuba Amendment merely removes Florida state and local governments from the company's customer list. <u>Id.</u>

Analyzed in terms of the global market for goods and services where Florida's procurement activities take place, the Cuba Amendment is no more an impermissible attempt at downstream regulation than Puerto Rico's prohibition of the use of non-Puerto Rican cement in construction projects funded by the Commonwealth or the United States.

### 4. The Cuba Amendment Is Not Inoperative By Its Own Terms.

Section 287.135 (9), Florida Statutes, as amended by Chapter 2012-196, Section 2, Laws of Fla., provides: "This section becomes inoperative on the date that federal law ceases to authorize the states to adopt and enforce the contracting prohibitions of the type provided for in this section." Below, the Secretary argued:

> Here, although the Act [Cuba Amendment] literally selects two countries by name and adds those to Iran and the Sudan already in the law, it is no coincidence that those are the four countries the federal government determined are state sponsors of terrorism….'[T]he elementary rule is that every reasonable construction

41

must be resorted to, in order to save a statute from unconstitutionality.'" *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007). Under this rule, the Savings Clause should be read to mean that, in the event the Secretary of State removes one of the countries affected by the Act from the State Sponsors of Terrorism list, the contracting prohibitions in the Act would no longer be enforceable.

(D.E. 15, p. 16)

The District Court concluded that the subsection (9) language rendered the Cuba Amendment inoperative because Congress has not authorized state-level sanctions against Cuba. (D.E. 24, p. 21) The lower court rejected the Secretary's argument because, as he saw it, the Secretary "provides no support for this interpretation and the interpretation contradicts the express terms of Section 9." (D.E. 24, p. 21) The Secretary's interpretation does not contradict the express terms of the subsection (9).

While the Secretary is constrained to advance on appeal the argument he made below, and does so without further comment, he nonetheless notes that if this Court determines that the Amendment is inoperative until such time as Congress authorizes state imposition of sanctions of the kind provided for in the Amendment, then Odebrecht, cannot now, or at any point in the future, prevail on a claim that the Amendment is unconstitutional either facially or as applied. In its inoperative state the Amendment is inert and would not afford circumstances under which a facial or an as applied challenge could be brought by Odebrecht much less pursued to a successful conclusion. Similarly, once the Amendment is rendered

operative by Congressional action approving its sanctions regime, there could be no colorable claim that the Amendment, either facially or as applied, collided with the Supremacy Clause, the Federal Foreign Affairs Power, or the Foreign Commerce Clause in a constitutionally offensive manner.

> **B. Odebrecht Failed To Establish That It Would Suffer Irreparable Injury Unless The Preliminary Injunction Issued.**

Should this Court conclude that Odebrecht failed to establish it would suffer irreparable injury arising from the Secretary's enforcement of the Cuba Amendment, the Court need not address the remaining elements. City of Jacksonville, 896 F.2d at 1285. Even if Odebrecht established a likelihood of success on the merits, the absence of irreparable injury would, standing alone, make preliminary injunctive relief improper. Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000).

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." City of Jacksonville, 896 F.2d at 1285 (quoting Sampson v. Murray, 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974)). A showing of irreparable injury is "the *sine qua non* of injunctive relief." Siegel, 234 F.3d at 1176; City of Jacksonville, 896 F.2d at 1285. The asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." Siegel, 234 F.3d at 1176; City of Jacksonville, 896 F.2d at 1285.

Notwithstanding this Court's unequivocal recognition that a showing of irreparable injury is the *sin qua non* of injunctive relief, the District Court summarily disposed of the issue stating:

> Plaintiff argues that it will suffer irreparable harm if the Cuba Amendment takes effect for three reasons: (1) the loss of its right to compete for state contracts, (2) the loss of revenues and profits from contracts, and (3) interference with its ability to partner with other firms and hire and retain employees. Defendant makes much of <u>Northeastern Florida Chapter of the Ass'n of General Contractors of America v. City of Jacksonville</u>, 896 F.2d 1283, (11th Cir. 1990), where the Eleventh Circuit held that irreparable harm does not result from a contractor's inability to bid on a contract. The contractor in <u>Northeastern Florida</u>, however, possessed the ability to sue the municipality for money damages. Here, Plaintiff's claims for money damages are barred by the Eleventh Amendment. When a plaintiff faces significant economic harm but cannot sue the state of Florida for money damages, "harm is irreparable as a matter of law." <u>ABC Charters</u>, 591 F. Supp. 2d at 1310 (citing <u>Temple Univ. v. White</u>, 941 F.2d 201, 215 (3d Cir. 1991); <u>Am. Fin. Servs. Ass'n v. Burke</u>, 169 F. Supp. 2d 62, 70 (D. Conn. 2001); <u>D.A.B.E, Inc. v. Toledo-Lucas County Bd. of Health</u>, No. 3:01 CV 7334, 2001 WL 1916730 (N.D. Ohio Jul. 6, 2001); <u>Clark Constr. Co. v. Pena</u>, 930 F. Supp. 1470, 1479-80 (M.D. Ala. 1996)). Therefore, Defendant's argument is inapposite and Plaintiff has adequately proven irreparable harm. [Footnotes omitted]

(D.E. 24, pp. 21-22)

While the 11th Amendment immunity bar of money damages has been held in some cases to render harm suffered by a movant irreparable as a matter of law, there is no authority in this circuit holding that 11th Amendment immunity relieves a movant of the obligation to demonstrate that it will suffer harm that is actual and

imminent rather than remote or speculative.  On the instant record, Odebrecht has not made the requisite showing with respect to the Secretary's intended enforcement of the Cuba Amendment.

The harm Odebrecht attributes to the loss of its right to compete for state contracts and the loss of revenues and profits from contracts, is based on an assumption, without an affirmative averment on the record, that Odebrecht, S. A., will elect to continue doing business in Cuba and thus subject Odebrecht to the Amendment's procurement restrictions.  Even if Odebrecht is subject to the procurement restrictions, a finding of harm as a result of the Secretary's enforcement of the Amendment necessarily assumes that Odebrecht would be the successful bidder on the Department contracts it intends to pursue.  The record counsels strongly against entertaining that assumption.

Odebrecht has not successfully bid on a Department contract in fifteen years. (D.E. 5, Exhibit 1-A; D.E. 15, Exhibit B, paragraph 4)  The record is silent as to whether this lack of contracting with the Department is a result of Odebrecht simply not bidding on work with the Department during that time period or the result of Odebrecht failing to submit a winning bid.  Either way, any harm Odebrecht would attribute to its inability to bid on Department contracts and any attendant loss of revenues and profits is entirely speculative.

Similarly unavailing is Odebrecht's contention that the potential enforcement of the Cuba Amendment has already interfered with its ability to partner with other firms and hire and retain employees. (D.E. 5, p. 17) A comparable averment was also set out in the affidavit of one of Odebrecht's vice presidents. (D.E. 5, Exhibit 1, p.5) However, neither the affiant, nor Odebrecht in its pleading, identified any of the potential partners, subcontractors, suppliers, or designers for a specific project who had voiced concerns nor did it provide a specific example of an employee it could not retain or a potential employee who refused employment due to the anticipated effect of the Cuba Amendment.

The District Court, on the instant record, mistakenly concluded that Odebrecht carried its burden to demonstrate that it would suffer irreparable harm by virtue of the Secretary's enforcement of the Cuba Amendment.

> C.   Odebrecht's Perceived Injury Does Not Outweigh The Harm An Injunction Would Visit Upon The State's Ability To Manage And Control Its Financial Affairs.

The District Court determined that the threatened injury to Odebrecht outweighed any alleged damage the proposed injunction may cause the Secretary on the basis of the following analysis:

> Defendant argues that an injunction would harm the Department's ability to carry out its duty to responsibly allocate limited public resources. Defendant, however, has not shown that the status quo has presented a

> problem or injured anyone. Moreover, the federal
> government has already enacted widespread regulation to
> safeguard this country. <u>See</u> Trading With the Enemy
> Act, 50 U.S.C. App. [Section] 5(b); <u>see</u> <u>also</u> <u>ABC</u>
> <u>Charters</u>, 591 F. Supp. 2d at 1305. Defendant will
> continue to derive a great benefit from the status quo
> every time Defendant awards a lower priced contract to a
> business such as Plaintiff's. In contrast, Plaintiff will be
> irreparably harmed if the Cuba Amendment is not
> enjoined.

(D.E. 24, p. 22) There are a number of flaws in the lower court's analysis.

First, the people of Florida, through their elected representatives, have determined that the status quo is unacceptable.

Second, although the federal Cuban sanctions regime is broad, it does, as demonstrated above, leave room for the State of Florida to legislatively control the expenditure of public procurement funds through proscriptions directed to entities doing business with Cuba. The federal scheme does not address this legitimate state concern.

Third, there is no showing on this record that there are other businesses such as Odebrecht's bidding on Department contracts and no record evidence that such businesses, if they exist, would ever be low bidders on Department contracts.

Finally, as previously demonstrated, Odebrecht has failed to show on this record that the Secretary's enforcement of the Cuba Amendment will cause it to suffer irreparable harm.

Odebrecht's asserted but not demonstrated potential injury resulting from the Secretary's enforcement of the Cuba Amendment does not outweigh the harm an injunction would inflict upon the pursuit of Florida's legitimate interest in not expending public funds to contract with firms that at are doing business with a state sponsor of terrorism.

### D.  A Preliminary Injunction Disserves The Public Interest.

With respect to the public interest element, the Secretary argued:

> The public, through its elected representatives, has made clear that it will no longer do business with those who would do business with countries designated by the federal government as state sponsors of terrorism. Enjoining the Department from enforcing the Act could frustrate that interest.  The Department agrees that the public has an interest in getting the best price for public works projects, but the injunction Odebrecht seeks would not significantly serve that interest.  Odebrecht is the Act's only challenger and Odebrecht has not been a serious contender for Department contracts in years. There is no evidence otherwise.

(D.E. 15, p. 20)

The District Court dismissed the Secretary's argument on the strength of its view that the public interest is already sufficiently protected by federal law and that the public interest is even greater served through a unified federal policy toward Cuba that is not impeded or restricted by the Secretary. (D.E. 24, p. 23)  As demonstrated above, the Secretary's enforcement of the Cuba Amendment will not

thwart the maintenance of a unified federal policy toward Cuba and fosters a legitimate state interest in not expending public funds to procure goods and services from entities doing business with a state sponsor of terrorism.

## CONCLUSION

On the instant record, Odebrecht has failed to carry its burden of demonstrating a substantial likelihood of success on the merits; that it will suffer irreparable injury unless the injunction is issued; that the threatened injury to Odebrecht outweighs the possible injury that the injunction may cause the opposing party; and that if issued, the injunction would not disserve the public interest. Accordingly, the District Court's Order Granting Preliminary Injunction should be reversed and the cause remanded for further proceedings.

Respectfully submitted,

/s/ Gregory G. Costas
Gregory G. Costas
FL Bar Number:  210285
Marc A. Peoples
FL Bar Number:  535338
FL Department of Transportation
605 Suwannee St., MS-58
Tallahassee, FL 32399
(850) 414-5265
gregory.costas@dot.state.fl.us
marc.peoples@dot.state.fl.us

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this initial brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief (excluding the

certificate of interested persons contains 10,980 words, and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it is prepared using Microsoft Word 2007, and Times New Roman, a proportionally spaced typeface, in 14-point font.


/s/ Gregory G. Costas
Gregory G. Costas


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 7, 2012, the foregoing Secretary's Initial Brief was served by first class U.S. Mail and by electronic mail to the following:

WHITE & CASE LLP
Raoul G. Cantero
T. Neal McAliley
200 S. Biscayne Blvd., Suite 4900
Miami, Florida 33131-2352
Email: rcantero@whitecase.com
Email: nmcaliley@whitecase.com

MOYE, O'BRIEN, O'ROURKE,
  PICKERT & DILLON LLP
James E. Moye
800 South Orlando Avenue
Maitland, FL 32751
Email: jmoye@moopd.com

*Counsel for Odebrecht Construction, Inc.*


/s/ Gregory G. Costas_____
Gregory G. Costas